# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 112 | **DATE** | 6/10/2003 |
| **CASE TITLE** | Hanekamp vs. McKesson Corporation | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order.  Defendant's motion for summary judgment [31-1] is granted in part and denied in part.  Judgment is granted in favor of McKesson on the Count II breach of implied-in-fact contract claim.  Summary judgment is denied as to the claims under Counts I, III and IV.  Case remains set for trial on July 14, 2003.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices  2

JUN 1 2 2003
date docketed

docketing deputy initials

6/10/2003
date mailed notice

| MD | courtroom deputy's initials |
|---|---|

**Document Number**

47

U.S. DISTRICT COURT
CLERK
03 JUN 10 PM 5: 39
FILED-ED-TO

Date/time received in central Clerk's Office

MD
mailing deputy initials

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| DANIEL J. HANEKAMP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 02 C 0112 |
| | ) | Judge Joan H. Lefkow |
| McKESSON CORPORATION, a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In this action filed by plaintiff, Daniel J. Hanekamp ("Hanekamp"), alleging

conversion/breach of stock option agreements (Count I), breach of implied-in-fact contract for

payment of severance pay (Count II), violation of the Attorney's Fees in Wage Actions Act,

705 ILCS 225/0.01 *et seq.* (Count III), and violation of the Illinois Wage Payment and Collection

Act, 820 ILCS 115/1 *et seq.* (Count IV), defendant, McKesson Corporation ("McKesson"), has

moved under Rule 56, Fed. R. Civ. P., for summary judgment as to the claims against it.

Hanekamp is a citizen of Illinois. McKesson is a Delaware corporation with its principal place of

business in California. The amount in controversy exceeds $75,000. The court, therefore, rests

its jurisdiction in 28 U.S.C. § 1332(a)(1) (diversity). For the reasons set forth below,

McKesson's motion is granted in part and denied in part.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

McKesson, a leading provider of supply, information and care management products and services, hired Hanekamp in October 1973 as an at-will employee without a contract of employment. (Def. L.R. 56.1 ¶¶ 3, 4.) Hanekamp was employed at McKesson until his termination on February 21, 2001. (Def. L.R. 56.1 ¶ 7.) From June 1998 until his termination, Hanekamp served as the Regional Vice President of Distribution Operations ("VPDO") at McKesson. (Def. L.R. 56.1 ¶ 5.) His responsibilities included McKesson's Carol Stream, Illinois, Distribution Center ("CSDC"), which is a shipping and receiving warehouse for

pharmaceutical supplies. (*Id.*) Hanekamp had operational, management, and financial responsibility for the CSDC. (Def. L.R. 56.1 ¶ 6.)

McKesson grants stock options to its employees, although the parties do not agree on why.[1] (Def. L.R. 56.1 ¶ 12.) Hanekamp received stock options under three different stock option plans. The stock options that Hanekamp received in 1993 and 1994 were governed by a 1978 stock option plan. (Def. L.R. 56.1 ¶ 16.) Stock options he received in January 1995, 1996, 1997, 1998 and 1999 were governed by a 1994 stock option plan. (Def. L.R. 56.1 ¶ 17.) Stock options received in August 1999 and January and October 2000 were governed by a 1999 stock option plan. As of February 23, 2001, Hanekamp had 18,185 vested stock options under the different stock option plans with a combined value of $253,849.25. (Pl. L.R. 56.1 ¶ 14.) Pursuant to the 1978 stock option plan, Hanekamp had 7,910 vested stock options worth $194,046.19. (Pl. L.R. 56.1 ¶ 1.)

For each of the three stock option plans (1978, 1994 and 1999), there were three different documents associated with those plans: a "Plan," a "Prospectus" and "Terms and Conditions." (Pl. L.R. 56.1 ¶ 2.) Under all three of the stock option plans, the Terms and Conditions stated

> If the employment of Optionee is terminated for cause, the option period shall end on the date of such termination of employment, and the option shall thereupon not be exercisable to any extent whatsoever.

(Def. L.R. 56.1 ¶ 20; Pl. L.R. 56.1 ¶ 117.) Only the 1994 and 1999 stock option plans defined the term "cause." The Terms and Conditions of those stock option plans provide that cause shall mean termination "upon Optionee's negligent or willful engagement of misconduct which, in the

---

[1] McKesson alleges that stock options are offered "to encourage managers to focus on long-term health and growth of the Company" and are given "as an expectation of future good performance." (Def. L.R. 56.1 ¶ 12.) Hanekamp alleges that the stock options are granted as an indication of good performance. (Pl. L.R. 56.1 ¶ 141.)

sole determination of the Company, is injurious to the Company, its employees, or its

customers." (Def. L.R. 56.1 ¶ 21.) Hanekamp testified that he believed the definition of "cause"

was akin to the definition of misconduct in McKesson's Employee Handbook, which states

> **Misconduct**–abusive language to fellow employees/supervisors, the possession
> and/or use of weapons of any kind, fighting, indecent conduct, obscene language
> or gestures, or committing any act that violates the state criminal code is a
> violation of the General Work Rules.
> In this same regard, physical, verbal or visual harassment of another employee,
> visitor, business associate or customer is not acceptable behavior. Furthermore, it
> is the policy of the Company to prohibit sexual harassment of its employees,
> customers and the general public in any form.

(Def. Ex. N.)

In 2000 and 2001, McKesson experienced a substantial loss of inventory at the CSDC.[2]

(Def. L.R. 56.1 ¶¶ 44-47.) The estimated cost of the losses was approximately $5-6 million.

(Def. L.R. 56.1 ¶ 46.) McKesson put substantial effort into researching the cause of the product

losses at the CSDC. (Def. L.R. 56.1 ¶ 49.) Ron Bone ("Bone"), McKesson's then Vice

President of Distribution Support, was given the responsibility for developing a team of people to

reconcile the inventory losses at the CSDC, provide findings on inventory issues, and suggest

corrective measures. (Def. L.R. 56.1 ¶¶ 36, 50.) In addition, Patrick Blake ("Blake"),

McKesson's President, Customer Operations, and Andrew Foster ("Foster"), Director of

Corporate Human Resources, conducted an investigation into the product losses. (Def. L.R. 56.1

¶ 51.) Blake and Foster's investigation focused on a variety of managers and executives with

responsibility for the CSDC. (*Id.*)

---

[2]The inventory losses included products such as Viagra, Paxil, Voltaren, Digoxin and Vicodin. (Def. L.R.
56.1 ¶ 45.)

In February 2001, William Hamik ("Hamik"), Senior Vice President of the Pharmaceutical Group, and Jan Hartley ("Hartley"), Director of Human Resources, requested that everyone with operational or management responsibility for the CSDC gather their pertinent documentation and prepare a chronological sequence of events which occurred at the CSDC. (Def. L.R. 56.1 ¶ 54.) On February 9, 2001, Hamik held a meeting concerning the investigation. (Def. L.R. 56.1 ¶ 55.) Hanekamp did not speak at this meeting because "[he] had a really bad sore throat at those times." (Def. L.R. 56.1 ¶ 59.)[3]

On February 16, 2001, Blake, Foster and Bone interviewed Hanekamp at McKesson's corporate offices in San Francisco, California. (Def. L.R. 56.1 ¶ 61.) Hanekamp was fully prepared to discuss the CSDC inventory losses at the February 16 meeting, including his role in discovering and correcting the situation. (Def. L.R. 56.1 ¶ 67.) When Hanekamp first tried to initiate a conversation reviewing the steps that were taken and events that occurred at the CSDC, he was cut off from the discussion by Foster and was only allowed to answer questions thereafter. (Pl. Resp. to Def. L.R. 56.1 ¶ 70.) The meeting mostly consisted of responding to "cycle count" discrepancy questions. The conclusion Hanekamp reached after the meeting was that the questioners were not interested in the process but were instead interested in blaming someone and that he could be one of those that were being blamed. (*Id.*) After the February 16 meeting, Hamik left a voicemail for Hanekamp stating that if he wanted to discuss anything about the

---

[3]McKesson also claims that it is undisputed that Hanekamp placed an undercover agent at the CSDC by the time of the February 9 meeting and that Hanekamp did not add this information to the chronology created at the meeting because he "would have been uncomfortable discussing that in a meeting of that." McKesson's statement of material facts identifies this "by the time of the February 16 meeting" and not the February 9 meeting. (Def. L.R. 56.1 ¶ 60.)

meeting he could call him. (Def. L.R. 56.1 ¶ 73.) Hanekamp did not speak to Hamik because he did not believe there was anything to be accomplished by doing so. (Def. L.R. 56.1 ¶ 74.)

Based on their investigation surrounding the CSDC product losses, Hamik, Blake, Foster and Bone determined that Hanekamp failed to act with the appropriate level of leadership for a VPDO. (Def. L.R. 56.1 ¶¶ 77-86.) Foster believed that Hanekamp should have acted with a greater sense of urgency. (Def. L.R. 56.1 ¶ 77.) According to Bone, Hanekamp failed to escalate the problem or react appropriately to the "cycle count variances." (Def. L.R. 56.1 ¶ 78.) Moreover, Bone felt as if Hanekamp's reconciliation of the cycle count discrepancies was inadequate and he did not effectively deal with the information he had to find out what the problems were. (*Id.*)

Blake believed that Hanekamp did very little to figure out the CSDC inventory loss situation, failed to have a sense of urgency with regard to the product losses or demonstrate an appropriate level of leadership. (Def. L.R. 56.1 ¶¶ 79-80.) Blake further believed that Hanekamp could have ensured that he had the most capable individuals in pivotal roles at the CSDC, handled cycle count discrepancies with a greater degree of urgency and import, made available appropriate resources, and made sure security warnings were addressed. (Def. L.R. 56.1 ¶ 82.)

After the February 9, 2001 meeting, Bone, Blake and Foster asked Hamik and Hartley to give them recommendations for personnel actions based on their findings. (Def. L.R. 56.1 ¶ 87.) Given their positions at McKesson, Hamik and Hartley were close to the CSDC inventory loss situation and were aware of Hanekamp's management of the CSDC. (Def. L.R. 56.1 ¶ 88.) Hamik and Hartley prepared a chart setting forth their findings and recommendations, and

6

provided it to Blake and Foster. (Def. L.R. 56.1 ¶ 89.) Hamik and Hartley's chart set forth their findings regarding the efforts of various managers to stem the product loss problem, including Hanekamp, Michelle Eilers ("Eilers"), McKesson's Director of Operations, Ron Vaske ("Vaske"), the Regional Controller and the security department. (Def. L.R. 56.1 ¶ 90.) With regard to Hanekamp, Hamik and Hartley's chart states, in part "After being advised of Claritin losses in May, no sense of urgency to understand losses." (Def. L.R. 56.1 ¶ 91.)[4] Hamik and Hartley's chart also indicates that Hanekamp failed to follow up on security theft issues, failed to follow-up with security after being notified of potential theft in the CSDC, provided little support to the CSDC after the Distribution Center Manager resigned, and provided little support to the new Distribution Center Manager.

Hamik and Hartley made their recommendation that Hanekamp's employment be terminated. (Def. L.R. 56.1 ¶ 93.) This recommendation was supported by Blake and Foster. (Def. L.R. 56.1 ¶ 98.) Hamik and Hartley made this recommendation based on the significant dollar losses at the CSDC, Hanekamp's lack of involvement throughout the investigation and his bad management decisions and poor management skills. (Def. L.R. 56.1 ¶ 94.) In making their recommendations for Hanekamp's termination, Hamik and Hartley discussed a variety of options, including progressive discipline under McKesson's field handbook. (Def. L.R. 56.1 ¶¶ 117, 121.) However, they decided not to use progressive discipline due to the amount of inventory lost and Hanekamp's lack of involvement in the investigation process and in the

---

[4]Hanekamp denies that the chart says this and cites to portions of his own statement of material facts. After searching through the ten paragraphs to which Hanekamp cites, they provide no support for his theory that the chart does not say this. Moreover, after looking at the chart as included in the exhibits, anyone can see that included in the column of what Hanekamp did not do was "After being advised of Claritin losses in May, no sense of urgency to understand losses."

facility. (*Id.*) Hamik and Hartley also recommended that Eilers be demoted and that Vaske be given a documented warning and a 50% reduction in his bonus for that year. (Def. L.R. 56.1 ¶ 96.) Bone, who did not take part in Hamik and Hartley's investigation, believed that Hanekamp should not be fired. (Pl. L.R. 56.1 ¶ 107.)

Blake made the ultimate decision to terminate Hanekamp's employment. (Def. L.R. 56.1 ¶ 98.) Prior to making his final decision, Blake reviewed Hanekamp's personnel file. (Def. L.R. 56.1 ¶ 101.) Blake discussed with Paul Julian ("Julian"), McKesson's President, what actions he had planned as well as what steps were being taken to contain the inventory loss issue. (Def. L.R. 56.1 ¶ 108.) Julian agreed with Blake's plans. (*Id.*)

On February 21, 2001, at a meeting in Chicago, Hamik and Foster told Hanekamp that his employment was being terminated because he failed to provide sufficient leadership expected of a VPDO with regard to the CSDC product losses. (Def. L.R. 56.1 ¶ 113.) During the meeting, Foster read a Separation Agreement to Hanekamp. (*Id.*) The Separation Agreement states, in part,

> As you are aware, the Company has conducted an internal investigation into the inventory issues at the Carol Stream Distribution Center. Based on that investigation, it has been determined that a number of key management personnel in the Central Region were negligent in their duties and obligations. The evidence indicates that you failed to provide the appropriate leadership expected of a Vice President of Distribution Operations. Therefore the decision has been made to terminate your employment with McKesson HBOC immediately.

(Def. L.R. 56.1 ¶ 115.)

In March 2001, Eilers was terminated for her lack of leadership in connection with the CSDC product losses. (Def. L.R. 56.1 ¶ 122.) While Hartley and Hamik recommended that Eilers only be demoted, Blake disagreed and made the decision to terminate Eilers. (Def. L.R.

56.1 ¶ 123.)  Hamik and Hartley's recommendations with regard to Vaske were followed, as he

was given a documented warning and a 50% reduction in his bonus for that year.  (Def. L.R. 56.1

¶ 124.)

On April 3, 2001, Hanekamp emailed Foster stating,

> I am in receipt of the . . . severance agreement . . . .  My interpretation of Item No.
> 6, Stock Options, is that I may continue to exercise all vested options until their
> date of expiration.  I would like to confirm that that is the Company's position.

(Def. L.R. 56.1 ¶ 142.)  Foster responded to Hanekamp's email on April 5, 2001 and stated that

he would attempt to get clarification for him.  (Def. L.R. 56.1 ¶ 143.)  Foster consulted with

counsel Leslie Sprinkle and came to the understanding that a provision in the stock option plan

restricted an individual terminated for cause from exercising vested options.  (Def. L.R. 56.1 ¶¶

144-145.)  No formal systems are in place at McKesson for determining whether a termination is

for cause--the decision is usually made by Human Resources after consultation with the legal

department.  (Def. L.R. 56.1 ¶ 151.)  The determination of whether an employee is terminated for

cause is normally made prior to termination.[5]  (Pl. L.R. 56.1 ¶ 156.)  At this point, in conjunction

with counsel, Jeanette Maggio ("Maggio"), McKesson's Vice President of Human Resources,

Foster and Julian determined that Hanekamp's termination was for cause.[6]  (Def. L.R. 56.1 ¶

146.)  Accordingly, Foster informed Hanekamp that his stock options were cancelled pursuant to

the provisions of the stock option plan.  (Def. L.R. 56.1 ¶ 152.)

---

[5]McKesson disputes this and argues that it does not have a policy of notifying the employee at the time of
their termination that it is for cause.  (Def. L.R. 56.1 ¶ 157.)  For purposes of this motion, the court credits
Hanekamp's version as true.

[6]An overview of what is considered "cause" is "violation of general work rules, violation of federal
policies."  (Pl. L.R. 56.1 ¶ 89.)  Examples of a "without cause" termination would be "attendance, policy violation,
safety violation, performance as it relates to the hourly employees, and their productivity measures."  (Pl. L.R. 56.1 ¶
90.)

After his termination, Foster provided Hanekamp with a Separation Agreement, which Hanekamp reviewed. (Def. L.R. 56.1 ¶ 170.) The agreement offered Hanekamp, as severance (or separation) pay,[7] the "equivalent of four (4) weeks of your base salary in effect as of the Separation Date . . . ." (*Id.*) To receive the severance (or separation) pay which was offered, Hanekamp was required to release any and all legal claims against McKesson. (Def. L.R. 56.1 ¶ 171.) On March 21, 2001, Hanekamp received another Separation Agreement identical to the original Separation Agreement, except that it increased the severance (or separation) pay offered to "the equivalent of twelve (12) weeks of your base salary in effect as of the Separation Date." (Def. L.R. 56.1 ¶ 177.) McKesson increased the amount of severance (or separation) pay offered to Hanekamp because it increased the amount given to Eilers. (Def. L.R. 56.1 ¶ 177.) Eilers was also required to sign a release, which she did. (Def. L.R. 56.1 ¶ 175.)

Hanekamp did not accept the March 21, 2001 Separation Agreement. (Def. L.R. 56.1 ¶ 178.) He did not attempt to negotiate the severance (or separation) pay offer with anyone because he did not believe it was negotiable. (Def. L.R. 56.1 ¶ 179.) Hanekamp believes that it is McKesson's policy to give all involuntarily separated employees one week of severance pay for each year they were employed by McKesson. (Def. L.R. 56.1 ¶ 184.)

At the time of Hanekamp's termination, no one knew the cause of the Carol Stream inventory losses. (Pl. L.R. 56.1 ¶ 93.) An undercover agent at Carol Stream did not complete his operation before February 27, 2001, and the last operative left Carol Stream in June 2002. (Pl.

---

[7]The parties dispute whether this offer was for severance or separation pay. McKesson maintains that the only time it is obligated to pay severance is when a facility has been closed or a position eliminated. (Def. L.R. 56.1 ¶ 158.) When an employee is terminated, McKesson claims that it does not normally give severance but instead usually provides a Separation Agreement. (*Id.*) Hanekamp disputes this and claims that McKesson's policy is to give all involuntarily separated employees one week of severance for each year they were employed by McKesson. (Pl. L.R. 56.1 ¶ 184.)

L.R. 56.1 ¶ 37.) A surveillance plan instituted in late 2000, which consisted of physical surveillance of the distribution center from both the rear portion of the building and the front portion of the building, did not end until June 2001. (Pl. L.R. 56.1 ¶ 38.) Moreover, the Federal Bureau of Investigation ("FBI") became involved with the CSDC losses in June 2001, and, according to Robert VanKirk, McKesson's Corporate Loss Prevention Director, as of November 6, 2002 there was still an ongoing FBI investigation. (Pl. L.R. 56.1 ¶ 39.)

## DISCUSSION

In Count I, Hanekamp alleges conversion/breach of stock option agreements against McKesson. In Count II, Hanekamp alleges breach of implied-in-fact contract for the payment of severance pay. Counts III and IV, alleging violations of the Attorneys Fees in Wage Actions Act and the Illinois Wage Payment and Collections Act, concern predominantly damages and turn on this court's resolution of the Count I and II claims.

A.    **Conversion/Breach of Stock Option Agreements**[8]

Hanekamp's conversion/breach of contract claim centers around his allegation that he had an unfettered right to exercise his vested stock options both prior to and after his termination, and that McKesson both converted his rights in the vested stock options and breached the stock option contract that governed. More specifically, Hanekamp alleges that he was not terminated for cause and, therefore, under the applicable stock option plan he had the continued right to the vested stock options. Conversely, McKesson claims that Hanekamp was terminated for cause

---

[8]Hanekamp maintains that there is a distinction between a claim for conversion and a claim for breach of contract, but that this distinction does not become critical until a calculation of damages is reached. Hanekamp cites *Scully v. US WATS, Inc.*, 238 F.3d 497 (3d Cir. 2001), in support of his view. Because any distinction is not relevant for purposes of this motion, the court will not differentiate between the two causes of action in Count I.

and that under the terms of all of the stock option plans a termination for cause extinguishes the employees' rights in the vested options.

The first issue for the court to determine concerns the 7,910 stock options issued under the 1978 stock option plan. Hanekamp argues that because the 1978 Plan does not define the term "cause" (unlike the 1994 and 1999 plans), an issue of fact exists as to what cause was and whether Hanekamp's actions would fall under any such definition. Moreover, Hanekamp claims that his understanding of cause was based on the definition of misconduct as set forth in McKesson's employee handbook, which consisted of such acts as abusive language, fighting and indecent conduct. In response, McKesson claims that the 1978 Plan was superseded by the 1994 Plan, which does set forth a specific definition of cause.

Based on the evidence as presented by the parties, the court concludes that an issue of fact exists as to whether the 1978 Plan was superseded by the 1994 Plan. McKesson relies on testimony from Kris Veaco ("Veaco"), Assistant General Counsel/Assistant Secretary, and Bill Parent ("Parent"), Compensation Manager. Both claimed that the 1978 Plan was replaced by the 1994 Plan. (Def. Resp. to Pl. L.R. 56.1 ¶¶ 124, 128, 144.) Moreover, McKesson cites to a number of stock option documents from the 1994 and 1999 Plans which explicitly state that "The Plan shall be the successor to the McKesson Corporation 1988 Restricted Stock Option Plan and the McKesson Corporation 1978 Stock Option Plan . . . ." (Def. Ex. R.) Hanekamp, however, points to what he alleges is an amendment to the 1978 Plan after the 1994 Plan went into effect. (Pl. Ex. C at 01836.) McKesson admits that Veaco was unaware of how this exhibit (Exhibit 7 to Veaco's deposition) indicates that an amendment to the 1978 Plan took place in 1997. Based on the parties' development of this issue, the court also is unaware how exhibit 7 relates to the

1978 Plan and considers this an issue of fact for trial. In any event, as stated below, under either "cause" as stated in the 1978 Plan or the definition of cause as "negligent or willful misconduct" as listed in the 1994 and 1999 Plans, the court believes that genuine issues of material fact exist.

Under California law, which governs the interpretation of McKesson's stock options, "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale* v. *Traders & General Ins. Co.*, 50 Cal. 2d 654, 658 (1958). McKesson concedes that such an implied covenant exists but states that it does not apply in this case, citing to *Third Story Music, Inc.* v. *Waits*, 41 Cal. App. 4th 798 (1995).[9] McKesson argues that, particularly with respect to the 1994 and 1999 Plans, the determination of whether an employee is terminated for cause is to be made "in the sole determination of the Company" and that this "plain, clear and unambiguous language" should allow the decision to terminate for cause to stand with little or no judicial interference.

While McKesson cites a situation in which an implied covenant of good faith was not applied, it advances no reason why this situation is applicable to this case. *Third Story Music* concerned a dispute between a company which owned the rights to music ("TSM") and a company with which TSM transferred the rights to manufacture, sell or distribute the music ("Warner"). *Id.* at 801. The agreement between the parties included a clause stating that Warner could choose "to refrain from" manufacturing, selling, or distributing the music, the very basis of the contract. *Id.* The court noted that the contract was "illusory" in that performance was totally

---

[9]McKesson's claim that no implied covenant of good faith and fair dealing exists is particularly curious in light of the fact that it attempted to have Hanekamp waive any such claim as a condition to the separation pay he was offered. (Def. Ex. O ¶ 13.)

within the discretion of Warner. *Id.* at 808. In stating, however, that no covenant of good faith and fair dealing need be applied to the contract, the court noted that a separate promise apart from the illusory promise to manufacture, sell or distribute the music was present in that the contract guaranteed that Warner was required to pay a certain amount to TSM. *Id.* The court noted that this consideration supported the agreement regardless of whether an implied covenant of good faith existed. *Id.*

Further, although McKesson points to a factual scenario where the covenant of good faith was not applied, there are many situations where the covenant applies to purely discretionary contracts. "California law, like the law in most states, provides that a covenant of good faith and fair dealing is an implied term in every contract . . . . The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Chodos* v. *West Publ'g Co., Inc.*, 292 F.3d 992, 997 (9th Cir. 2002) (internal citations omitted). The employment context presented in this case arguably is even a more appropriate area for application of a covenant of good faith and fair dealing. In *Locke* v. *Warner Bros., Inc.*, 57 Cal. App. 4th 354 (1997), the court stated,

> Therefore, when it is a condition of an obligor's duty that he or she be subjectively satisfied with respect to the obligee's performance, the subjective standard of honest satisfaction is applicable . . . . Traditional examples are employment contracts . . . . In such cases, the promisor's determination that he is not satisfied, *when made in good faith*, has been held to be a defense to an action on the contract.

*Id.* at 363-64 (emphasis in original) (internal citations and quotations omitted). To the extent McKesson argues that an employer should be given the right to make a completely discretionary determination of cause in the absence of even an implied covenant of good faith, the court

14

disagrees. Rather, McKesson's discretion to determine whether a termination was for cause was limited by its implied covenant of good faith and fair dealing.

In *Cotran* v. *Rollins Hudig Hall Int'l, Inc.*, 17 Cal. 4th 93 (1998), the California Supreme Court set out factors for determining "good cause" for terminating an employee for misconduct when an implied employment contract existed. The court interpreted the term "good cause" to mean

> fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond.

*Id.* at 108. *See also, Silva* v. *Lucky Stores, Inc.*, 65 Cal. App. 4th 256, 264 (1998) ("Three factual determinations are relevant to the question of employer liability: (1) did the employer act with good faith in making the decision to terminate; (2) did the decision follow an investigation that was appropriate under the circumstances; and (3) did the employer have reasonable grounds for believing the employee had engaged in the misconduct.").

McKesson focuses its analysis concerning good faith on its investigation and decision to terminate Hanekamp. McKesson argues that Hanekamp was not terminated until a full investigation into the product losses at the CSDC took place and during such investigation he was given an opportunity to inform McKesson of his role and to defend his actions. Notably, however, this evidence only deals with the initial determination to fire Hanekamp which, while certainly relevant, does not necessarily speak to the decision made that Hanekamp was fired *for cause.* It is undisputed that McKesson did not inform Hanekamp or otherwise make the decision that his termination was for cause until over a month later. The issue of whether the termination

was for cause did not come up until Hanekamp inquired about the status of his stock options. This evidence is pertinent in light of the disputed issue among the parties concerning whether the determination for cause is made prior to termination and whether an employee terminated for cause is normally informed of such status at the time of termination. (*Compare* Def. L.R. 56.1 ¶ 157 *with* Pl. L.R. 56.1 ¶¶ 78, 156, 157.)

Moreover, the court is presented with little evidence concerning the actual determination of "cause" to say that it was in good faith as a matter of law. If unsatisfactory performance as well as misconduct amounts to cause, perhaps few separated employees would receive their stock option benefits. It is undisputed that no formal mechanism is in place at McKesson for determining whether a termination is for cause. (Def. L.R. 56.1 ¶ 151.) While McKesson is correct that such a mechanism is not required, any such procedures would certainly be probative of the issue as presented here and foreclose issues of fact surrounding the determination in this case. McKesson states that the decision for cause is usually made by Human Resources after a consultation with the legal department. (*Id.*) Here, the decision was apparently made by Foster, although it is unclear whom he consulted in making such a decision. McKesson claims Foster made the decision in conjunction with counsel and with Maggio and Julian, but it also admits that "[t]here are no individuals at McKesson that provided input to Mr. Foster in his decision to cancel [Hanekamp's] stock options after April 3, 2001." (Def. Resp. to Pl. L.R. 56.1 ¶ 63.)

Foster himself never received any formal training at McKesson for determining what "cause" was for purposes of McKesson's stock option plans, (Pl. L.R. 56.1 ¶ 65), although he does claim to have been involved in "for cause" determinations in the past. (Def. L.R. 56.1 ¶ 148.) Foster also stated that nothing in writing gives guidance to a McKesson employee in

16

determining which terminations of employment are for cause and which are not. (Pl. L.R. 56.1 ¶ 66.) Finally, in other cases involving misconduct such as theft or workplace violence, which would clearly constitute negligent or willful misconduct, Hartley testified that McKesson denied or disputed unemployment compensation to employees. (Pl. L.R. 56.1 ¶ 161.) In this case, evidence is presented that McKesson did not contest Hanekamp's claim for unemployment compensation and the State of Illinois determined that the termination was for "unsatisfactory performance." While McKesson claims this was part of a compromise that was offered to both Eilers and Hanekamp and that an individual can be terminated for cause and still receive unemployment compensation, (Def. L.R. 56.1 ¶¶ 190-91.), this is all evidence that can be weighed by the trier of fact.

Insofar as under California law the elements of the "good cause" standard are triable to a jury, *see Cotran*, 17 Cal. 4th at 108, and because the "for cause" determination was made 30 days after Hanekamp was terminated with no illumination as to what was considered and with no formal procedures in place, the court concludes this case presents genuine issues of material fact for the trier of fact to decide. This conclusion applies either under the 1978 Plan definition of "cause" and/or the 1994 and 1999 definition of cause as "negligent or willful misconduct." Contrary to McKesson's suggestions, the court simply cannot say as a matter of law that the decision that Hanekamp was terminated for cause was made in good faith. Summary judgment on the Count I claims, therefore, is denied.[10]

---

[10]Throughout his brief Hanekamp urges the court to grant summary judgment in his favor, even though he never formally made such a motion. While the court acknowledges that it has the power to grant summary judgment *sua sponte*, as stated above there are genuine issues of material fact for a trier of fact to decide concerning whether the decision to terminate Hanekamp for cause was made in good faith and was not arbitrary and capricious.

**B.      Breach of Implied-in-Fact Contract For Payment of Severance**

Hanekamp alleges that McKesson had an implied-in-fact contract for payment of severance pay to its terminated employees. An implied-in-fact contract exists when an agreement creating an obligation is implied or presumed from the actions of the parties. *Barefield* v. *Village of Winnetka*, 81 F.3d 704, 709 (7th Cir. 1996), quoting *Foiles* v. *North Greene Unit Dist. No. 3*, 261 Ill. App. 3d 186, 633 N.E. 2d 24, 25 (1994). A "meeting of the minds" is required for an implied-in-fact contract to exist. *Id.*, quoting *Foiles*, 633 N.E. 2d at 25 ("A contract implied in fact must contain all elements of an express contract, and there must be a meeting of the minds."); *Binder* v. *Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999) ("To form a contract, a manifestation of mutual asset is necessary . . . . Mutual asset may be manifested by written or spoken words, or by conduct.") (internal citations omitted).

Hanekamp's claim for a breach-of-implied contract is puzzling. In response to McKesson's claim that it was not required to give severance pay but could have given separation pay, Hanekamp stated, with no citation, that "[t]here is no question that [Hanekamp] was owed severance pay–the only question is how much?" Hanekamp also claims, again with no citation to the record, that "[o]nly the amount of money is in question and apparently is discretionary and done on a 'case-by-case basis.'" Hanekamp claims that because McKesson offered 12 weeks of either separation or severance pay conditioned on his waiving his right to bring suit under the stock option plans, summary judgment should be denied.

The evidence presented shows no implied contract in which McKesson was obligated either to offer severance pay to employees or if it did offer such pay that it could not condition the severance or separation payments on waiving the right to bring suit. McKesson offered

18

Hanekamp severance (or separation) pay and conditioned acceptance on Hanekamp signing a release agreeing not to sue based on the stock option plans. The agreement did not say that Hanekamp must waive all his stock options, even if that may have been the result if he had signed the agreement in this case. Hanekamp refused the offer. The court is unaware of how any of this creates an implied-in-fact contract. Hanekamp presents no evidence as to how McKesson was obligated to either offer severance (or separation) pay or that such pay could not be conditioned or bargained for in exchange for suit not being filed under the stock option plans. In fact, there is nothing implied about his contract. McKesson offered 12 weeks of pay with a condition, and Hanekamp refused it. As such, summary judgment is granted in favor of McKesson on the Count II breach of implied-in-fact contract claim.

## C. Counts III and IV

Neither party presents argument on the Count III claim under the Attorney's Fees in Wage Action Act and the Count IV claim under Illinois Wage Payment and Collection Act, apparently on the belief that these claims either rise or fall based on the claims in Counts I and II. Since the Count I claims survive for trial, the court assumes the Count III and IV claims do also. As such, summary judgment is denied on these claims.


## CONCLUSION

For the reasons stated above, McKesson's motion for summary judgment is granted in part and denied in part [#31]. Judgment is granted in favor of McKesson on the Count II breach of implied-in-fact contract claim. Summary judgment is denied as to the claims under Counts I,

III and IV. This case is set for trial on July 14, 2003. In the meantime, the parties are directed to meet in a sincere effort to resolve this case short of trial.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: June 10, 2003